MaddeN, Judge,
delivered the opinion of the court:
The plaintiff sues to recover income taxes and interest thereon, collected from him for the years 1944, 1945, and 1946. During those years he was a member of two successive partnerships, in the first of which his wife and his son Danny, *397 together with the widow of his deceased brother and two of her children were also partners, and in the second of which his wife and four of his sons were partners. This case is concerned only with the partnership relations of the plaintiff and his wife and sons.
The partnerships made substantial profits in the years in question, and various parts of those profits were reported by the plaintiff’s wife and sons as their income. The Government’s tax authorities took the position that all of the profits included in the wife’s return and a large part of the profits included in the returns of the four sons should have been included, instead, in the plaintiff’s own returns. If they had been, they would have been in brackets carrying higher tax rates.
The business carried on by the partnerships was that of manufacturing dolls, under the trade name Uneeda. The plaintiff Morris and his wife Jennie, before and after their marriage, worked in the toy industry. In 1918 they bought, with funds supplied largely by Jennie from savings and borrowings, a $2,500 interest in a doll and toy manufacturing firm, and went to work for that firm.
Morris’ brother Benjamin had a doll factory, the Uneeda Doll Co. Benjamin invited Morris and Jennie to change their investment and employment to his firm and on Jennie’s insistence they did so, in 1922, Morris receiving 25 percent of Uneeda’s capital stock. Jennie was talented in designing and styling dolls and selecting materials for doll dresses, and her work contributed substantially to the large increase in the firm’s business. In recognition of her services, Benjamin in 1925 transferred 15 percent more of the capital stock of Uneeda to Morris, so that thereafter Benjamin owned 60 percent and Morris 40 percent of the stock. Benjamin died in December 1942.
The corporation continued to carry on the business until it was dissolved at the end of 1943. At that time a limited partnership was formed, with Morris and Dora, the widow and administratrix of Benjamin, as general partners and two daughters of Benjamin, and Jennie, and Danny, the eldest son of Morris and Jennie, as limited partners. The partnership had a capital of $100,000, each family having a *398 combined share of $50,000. The partnership agreement stated the capital contributions of Morris, Jennie, and Danny to be $25,000, $10,000, and $15,000, respectively. The plaintiff says that before the dissolution of the corporation he had given some of his shares in it to Jennie and Danny, the number of shares to each being in substantially the proportions which their contributions to capital were stated to be in the partnership agreement. Whether he made the gifts of the corporate stock, or the gifts of shares in the partnership which now had the assets of the corporation, is not of vital importance. In Williamson v. United States, ante, p. 183, this day decided, we have discussed the subject of gifts creating shares in family partnerships.
As to Jennie, at least, she well deserved to have a share in this dollmaking enterprise since her funds and initiative and talents had contributed largely to its success, and to the size of the share which Morris had in it.
The partnership agreement made careful provision for several ways in which the partnership might be terminated. Under these provisions, the equal interests of the families of Morris and Dora were each to be kept intact inside the respective family. The Dora interests agreed that upon termination or dissolution they would sell their interests to Morris at their book value, thus charging nothing for the name and goodwill of the enterprise.
There was no provision permitting a limited partner to withdraw his capital contribution. The agreement provided for distribution of profits to the partners, but it was tacitly understood that Danny would conserve his profits so as to provide the funds necessary for the eventual participation of his brothers, Bernard, Irwin, and Samuel in the business as partners.
The business made enormous profits in the year 1944, $327,350.97 on the stated capital of $100,000. The Government urges, in relation to this and the other years in question, that these profits prove that the capital represented by the shares of the limited partners contributed little to the profit-making capacity of the business; that the trade name, goodwill, and other intangibles were of great value and Morris, in the partnership agreement, retained the ownership of these *399 by retaining the right to buy the shares of the limited partners on his side of the family for the book value of the assets other than these intangibles.
In September of 1944 Dora desired to withdraw $50,000 from the partnership funds for herself and her daughters. That was done, and at the same time the Morris family withdrew a similar amount, in checks of $25,000, $10,000, and $15,000 to Morris, Jennie, and Danny, respectively. All three of these checks were deposited in Morris’ personal bank account. Danny was, at the time, in the military service in California. His $15,000 was, in accordance with the prior understanding which we have referred to above, used as a part of the capital contribution of his brothers, Bernard, and Samuel, to the succeeding partnership, which will be discussed in its turn. Jennie’s $10,000 withdrawal was used by Morris with her consent as a part of the price for the purchase by the partnership of a corporation which owned the building in which the partnership business was carried on.
We think the $15,000 withdrawn by Danny from the 1944 partnership, which was intended to be later used to pay for the shares of his brothers, Bernard and Samuel, was taxable to Morris. The gifts of shares in the partnership to the brothers were really to come from Morris, not from Danny, and until the gifts were completed the money belonged to Morris, though the checks were written to Danny.
In the autumn of 1944 Morris decided to terminate the partnership which included Dora and her family and form a partnership including only members of his own family. Dora and her daughters were paid what they were entitled to under the 1944 partnership.
The new partnership was a limited partnership with Morris as the only general partner and Jennie, Danny, Bernard, and Samuel, and Morris as trustee for Irwin, as limited partners. Morris’ capital contribution was stated as $40,000, Jennie’s $20,000, and each of the others, $10,000, a total of $100,000. The agreement provided that, if the general partner so requested, the limited partners would have to contribute 50 percent of their profits to the capital of the partnership. It provided that no limited partner could assign his interest but that the general partner had the right, *400 on thirty days’ notice, to buy the interest of a limited partner.
The partnership commenced operations under this agreement as of January 1, 1945, and continued until March 2, 1946, at which time it was succeeded by a corporation, the stock in which was owned by Morris, Jennie, and the four sons. The instant suit involves only the period of the two partnerships. The 1945 partnership made large profits, as had the earlier one. The limited partners drew out little more than enough of their profits to pay their income taxes, leaving the rest to be added to their capital accounts.
Morris, the father, introduced his sons to the family business while they were mere children, by having them spend their time in and around the plant doing what chores they could. As they grew up they were often in the plant after school, on Saturdays, and during vacations. The eldest son Danny began in 1938 to work full-time for the firm, after partial completion of a college course. He worked in the production and selling departments and received a modest salary. He was inducted into the Army in 1941 and discharged in 1945. His Army service was in Texas and California. By letter and occasionally by telephone he was consulted about the family business, as he was well-versed in production problems. He was consulted about the 1944 and 1945 partnership agreements. Immediately on his discharge from the Army he returned to the factory and has been employed in the family business ever since.
Bernard finished high school in 1941. He worked for Uneeda for a few months, then worked in a defense plant for a year, then worked again for Uneeda. He became' 18 in 1943 and was inducted into the Army, and discharged in 1946. His Army service was at Aberdeen, Maryland. When he had a weekend pass, he went to New York and on Saturdays painted dolls’ heads and was paid the usual rate for it. Upon his discharge from the Army in 1946, he worked for Uneeda for a short time, then went to work for a chain of retail appliance, radio, and television stores, and continued in that employment until 1954. During those eight years he did no work for Uneeda. In 1954 his father told him that Uneeda needed a salesman, and he went to work for Uneeda for $12,500 per year.
*401 Irwin went to college with the idea of going to medical school. Upon graduation from college he entered the Navy-in 1943 and was released from active duty in 1946. Irwin had taken no interest in the business during his college vacations, and after his release from the Navy he informed his father that he had no interest in the business. He has had no relation to the business since that time and has had, apparently, no share in the successor corporation, because he has been supported by his father and listed by him on his income tax return as a dependent during several of the years following 1946.
Samuel finished high school in 1943, worked part-time at Uneeda for six months, went to college, became ill, worked occasionally at Uneeda while recuperating, went to college again, and in January 1945, left college and became a supervisor in the production department of Uneeda, where he has been employed ever since.
Our question is whether the partners in these two family partnerships “really and truly intended to join together for the purpose of carrying on the business and sharing in the profits or losses or both”. Commissioner v. Culbertson, 337 U. S. 733, 741. See Williamson v. United States, sufra.
Morris, the husband and father, very greatly desired that his sons interest themselves in and take part in the management of his thriving business. We have already discussed the situation of the wife, Jennie, and her interest in and contribution to the success of the business, which earned for her a share in it. As to the sons, two of them, Danny and Samuel, worked in the business from childhood, except for Danny’s period of military service, and still work in it. It was entirely natural that they should want to have, and that their father should want them to have, a proprietary interest in this family business, so that they would share in its success or lack of success. As to the other two sons, Bernard and Irwin, no doubt their father’s hopes for them were the same as for the other sons. In the case of Bernard, there was good reason for that hope, since he had shown much interest and industry in the enterprise. The fact that, after the termination of the partnership here in question, he went to work for another employer, is no evidence of the intention of the par *402 ties in the period here in question. As to Irwin, it would have been invidious to have omitted him from the 1945 partnership while he was in the Navy, although he had never shown any interest in the business and was not, apparently, temperamentally suited for a business career.
The Sklarsky family was well-suited to a patriarchal kind of family business, in which several, or all who desired, would take part. The business owned by the father was the kind of relatively small business in which any of the sons who was willing to work could fill a useful place and promote the success of the business more than could unrelated employees. The sons were not taken into the business as mere children, as they might have been if the principal aim of the father had been the avoidance of taxes. Before they were given proprietary interests in the business, they were paid only ordinary compensation for their work for it.
The fact that the sons left their profits in the business, rather than withdrawing them and spending them elsewhere, does not seem unnatural to us. Their interest in the business, and their hope for further profit from it, as well as their willingness to comply with the wishes of their father, would explain that. Their rallying to the aid of their father, when he was faced with a large income tax deficit, the deficit being based upon the Government’s contention that the profits credited to the sons belonged, in fact, to the father, was what any father would hope for from his sons.
The Government’s contention, noted above, that the trade name and goodwill of the business, which were kept within the control of the father, and the father’s skill and initiative as the principal executive of the business, generated a larger share of the profits than the father’s capital account attributed to him, is probably well-founded. If it were our function, or that of the Commissioner of Internal Eevenue, to reform the partnership agreements so that they would more exactly attribute income to the partners on the basis of the profit-making capacity of their contributions of capital or services, this might well be a suitable case for doing that. But the function of the Commissioner of Internal Kevenue, and of ourselves, is much more limited. It is only to determine, from all the evidence, whether these were real partnerships, or only pretended ones.
*403 The commissioner of this court has furnished to the parties and the court an able, careful and accurate report, distilled from a long transcript of testimony and a large number of exhibits. The brief of counsel for the plaintiff contains offensive and ill-mannered language with regard to that report. No public official who has the responsibility of deciding disputed questions should be subjected to that hind of language. If it were not for the undeserved delay and expense which would have been caused the client, we would have rejected the brief and required the substitution of an expurgated one.
We conclude that in 1944 there was a valid family partnership composed of Morris as general partner and Jennie and Danny as limited partners and that the income attributed to Jennie and Danny which the Government redistributed to Morris alone is taxable to the respective limited partners, except for the distribution of $15,000 to Danny, which Morris allegedly held for Danny and which was to be used for the capital contribution of Bernard and Samuel in the succeeding partnership, which amount is taxable to Morris.
There was a valid family partnership in 1945-1946 between Morris as general partner and Jennie, Danny, Bernard, Samuel, and Irwin as limited partners. Therefore, the income attributed to these limited partners which the Government reallocated to Morris is properly taxable to the respective limited partners, with the exception of $10,000 which was charged to Danny’s capital account to pay for the capital contribution of Irwin upon his admission to the 1945 partnership (finding 14 (b) (c)). This $10,000 is in precisely the same position as the $15,000 of Danny’s income accumulations which Morris used to provide for the admission into the 1944 partnership of Bernard and Samuel as to which we have concluded it was income taxable to Morris. In effect, Morris actually controlled the disposition of Danny’s income to the extent of $10,000 and must be taxed as though it were his income.
The plaintiff is entitled to recover in accordance with this opinion and judgment is entered to that effect with interest thereon as provided by law. The amount of recovery will be determined by further proceedings under our Rule 38 (c).
It is so ordered.
*404 Lahamoee, Judge; Whitakee, Judge; Littleton, Judge; and JONES, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. This is an action for refund of federal income taxes in the sum of $119,944.84 with interest, for the years 1944,1945, and 1946, paid during 1949. The claims for refund were filed on March 7, 1950, and denied by the Commissioner of Internal Revenue. The petition was filed in this court on November 27, 1950.
2. During the taxable years involved the plaintiff, Morris Sklarsky, resided in Brooklyn, New York, and engaged in business in New York City. His personal income tax returns and the partnership returns in the name of Uneeda Doll Co. (hereafter “Uneeda”) were filed in New York City.
3. During the taxable years in controversy the plaintiff’s family, besides himself, consisted of his wife, Jennie, and his sons Danny (sometimes referred to as Daniel), Irwin, Bernard, and Samuel, born respectively in 1919, 1923, 1925, and 1926. In addition, plaintiff has two minor sons, Jerome and Arnold, born in 1939 and 1945, respectively, who are concerned only collaterally in the issues. For brevity, the members of the Sklarsky family will be referred to hereafter by their given names.
4. (a) Plaintiff’s questioned income derived principally from the operations of Uneeda, a doll manufacturing concern in New York City, with which company he and Jennie had been closely associated from its inception in 1922. By way of background, prior and subsequent to their marriage Morris and Jennie were employed in the stuffed toy manufacturing industry. In 1918 they purchased, with funds supplied largely by Jennie from borrowings or savings, a $2,500 interest in the doll and toy manufacturing concern of Max Rubin and Sons, to which concern they transferred their employment.
*405 (b) Morris’ brother,.Benjamin Sklarsky, was also engaged on his own account in the manufacture of dolls under the name Uneeda Doll Co. On Jennie’s insistence and Benjamin’s invitation, Morris and Jennie withdrew their investment in Max Eubin and Sons and joined Benjamin in Uneeda, then a corporation, in 1922. Benj amin owned 75 percent and Morris 25 percent of Uneeda’s capital stock.
(c) Jennie engaged actively in the designing and styling of the dolls and she contributed substantially to the large increase in the firm’s business. Her services to Uneeda in creation of styles and selection of materials for doll dresses, which are important functions in the highly competitive doll industry, continued without major interruption for many years, diminishing only during interludes of childbirth or illness, and dwindling during the taxable years in question. In recognition of Jennie’s services, in 1925 Benjamin transferred 15 percent of his shares in the corporation to Morris, and thereafter ownership of the corporation vested 60 percent in Benjamin and 40 percent in Morris. Benjamin died in December 1942. At his death he owned 344 shares and Morris owned 230 shares.
1943 CORPORATION
5. Uneeda’s corporate status continued beyond Benjamin’s death in December 1942. His 344 shares passed to his wife, Dora Sklarsky, as administratrix of his estate. Morris continued to hold 230 shares.
6. (a) Plaintiff testified that in February 1943 he gave 46 shares of his Uneeda stock to Jennie and 69 shares to Danny. The stock certificates were not in evidence, Danny alleging that he destroyed his after June 1945. The minutes of a stockholders’ meeting held in December 1943 to dissolve the corporation and form a partnership, which were prepared by the corporation’s attorney to accompany an information return filed with the Internal Kevenue Service, recite the names of all stockholders but omit the names of Jennie and Danny as stockholders. Morris filed gift tax returns in March 1944 reporting the stock gifts, and they were also reflected in the joint income tax returns of Morris and Jennie filed the same month. No stockbooks or other records of the *406 corporation were offered in evidence to support the stock gifts, such records reportedly being unavailable. Neither Jennie nor Dora Sklarsky, nor the attorney who prepared the corporation’s dissolution papers were called to testify, Jennie being excused by the trial commissioner on the basis of a doctor’s certificate that her physical condition was such that subjection to trial would jeopardize her health.
(b) The evidence does not support the claim that the alleged gifts of stock were in fact made by the plaintiff to Jennie and Danny.
7. The corporate stockholders met on December 20, 1943, and formally resolved to dissolve the corporation at the end of the year. The dissolution was duly reported to the Internal Revenue Service as required by section 148 (d) of the Code.
1944 PARTNERSHIP
8. The preceding corporation having been dissolved, a limited partnership agreement was entered into pursuant to the laws of New York under date of December 31, 1943, between Morris and Dora, parties of the first and second part, as general partners, and Lillian Winters, Ruth Schwartz, Jennie, and Danny, parties of the third, fourth, fifth, and sixth parts, as limited partners. Lillian Winters and Ruth Schwartz were the daughters of Dora Sklarsky. Pertinent provisions of the partnership agreement were as follows:
3rd: The said partnership shall be conducted under the firm name and style of UNEEDA DOLL CO.
4-th: That the said partnership shall commence on the 1st day of January, 1944, and shall continue for the period of one year, ending on the 31st day of December, 1944, it being understood and agreed, however, that if no notice is served by one of the general partners upon the other general partner on or before October 1st, 1944, requesting that this partnership shall be#dissolved on the 31st day of December, 1944, then and in such event, this partnership shall be deemed renewed for a further and additional period of one year. * * * this partnership agreement shall be renewed from year to year until a notice requesting dissolution is served by one of the general partners upon the other general partner oh or before October 1st of any year of the term of this agreement.
5th: [Contributions to the partnership capital of *407 $100,000.00 to be in cash and personal property as follows:
Morris Sklarsky_$25,000.00 Dora Sklarsky_$20,000.00
Jennie Sklarsky 10,000. 00 Lillian Winters 15,000.00
Danny Sklarsky 15,000.00 Ruth Schwartz 15,000.00]
[6th, 7th, and 8th: Allocation of profits realized or losses sustained in operations, and distribution of net assets upon dissolution of the partnership to be in accordance with the above contributions to capital, per-centagewise.]
$ $ $ $ $
12th: It is further agreed that all checks, notes and evidences of indebtedness made by or for or in behalf of the partnership shall be signed by either of the General Partners.
:J« # # i?c ❖
15th: (a) The Party of the Second Part, may withdraw from the said partnership * * *. In the event of such withdrawal, the Parties of the Third and Fourth Parts agree that they will withdraw from the partnership at the same time as the Party of the Second Part withdraws. * * * In the event of the withdrawal of the Parties of the Second, Third and Fourth Parts, said parties agree to sell, assign and transfer to the Party of the First Part and the Party of the First Part agrees to purchase their respective shares and interests in the co-partnership assets, including the exclusive right to use the name Uneeda Doll Co. and the good will of the business at book value thereof, * * *.
(b) The Party of the First Part may withdraw from the said partnership * * *. In the event of such withdrawal, the Parties of the Fifth and Sixth Parts agree that they will withdraw from the partnership at the same time as the Party of the First Part withdraws. * * * In the event of the withdrawal of the Parties of the First, Fifth and Sixth Parts, the Party of the First Part agrees that he will purchase from the Parties of the Second, Third and Fourth Parts their respective shares and interests in the co-partnership assets, including the exclusive right to use the name UNEEDA DOLL CO. and the good will of the business and the said Parties of the Second, Third and Fourth parts agree to sell to the Party of the First Part their respective shares and interests in the co-partnership assets, including the exclusive right to use the name UNEEDA DOLL CO. and the good will of the business at book value thereof, * * *,
*408 16th: In the event of a dissolution or termination of the partnership, the Party of the First Part agrees to purchase the shares and interests of the Parties of the Second, Third and Fourth Parts, including the exclusive right to use the firm name, UNEEDA DOLL CO. and the good will of the co-partnership business, and the Parties of the Second, Third and Fourth Parts agree to sell to the Party of the First Part their said respective interests, at book value thereof, * * *
$ ‡ $
81st: In the event of the death of the Parties of the Fifth or Sixth Parts, the Party of the First Part agrees to purchase and the Parties of the Fifth and Sixth Parts agree that the shares and interests of such deceased partner or partners shall be sold to the Party of the First Part, and it is agreed that the co-partnership shall be continued under the terms, covenants and conditions set forth in this agreement, and the Party of the First Part agrees to pay for such shares and interests, at a price and upon terms to be agreed upon between the Party of the First Part and the personal representative of the deceased Party or Parties of the Fifth or Sixth Parts.
88nd: To determine the book value of the net assets of the co-partnership for all purposes referred to in this agreement, * * *
(a) Goodwill, trademarks, tradenames and copyrights shall be deemed of no value.
* * * * Ü*
The agreement contained no provision permitting a limited partner to withdraw his capital contribution. While the agreement provided for distribution of profits to the partners, it was tacitly understood that Danny would conserve his profits so as to provide the funds necessary for the eventual, participation of his brothers in the business as partners. This understanding was more in the nature of a moral commitment than a legal obligation.
9. The stock gifts in 1943 to Jennie and Danny from Morris of 46 and 69 shares in the 1943 corporation, described in finding 6, were valued at $8,372 and $12,558, respectively, in plaintiff’s gift tax return filed in 1944. The opening entries in the 1944 partnership records reflect initial capital accounts for Jennie and Danny of $10,000 and $15,000, respectively, apparently supplied by and based on their alleged stock ownership in the predecessor corporation. The differ *409 ence between the required contributions and the reported value of the stock is not significant, for the stock increased in value between February 1943 and the end of the year.
10. The following schedule sets forth the net profits of the partnership during the calendar year 1944, the book distribution thereof among the partners, withdrawals during 1944 by the partners, and the resultant capital accounts of the partners at the end of the year:

11. (a) Disagreements arose among the partners during the summer of 1944. In September Dora Sklarsky (by then Dora Barish due to her remarriage) notified Morris that she wished to withdraw $50,000 from the partnership for herself and her two daughters. This withdrawal was effected on September 5 and charged against the capital accounts of Dora, Ruth, and Lillian. On September 7 matching withdrawals totaling $50,000 were made by Morris, Jennie, and Danny in the respective amounts of $25,000, $10,000, and $15,000. The withdrawals by all partners exactly equalled their starting capital in the partnership.
(b) The checks drawn on September 7 to the order of Morris, Jennie, and Danny were endorsed by or with the consent of the payees and deposited by Morris in his personal bank account. Morris received Jennie’s $10,000 under an oral trust and shortly afterwards applied it as her contribution to the purchase of Broome .Affiliates, Inc., a corporation which owned the building occupied by Uneeda as lessee. Morris held Danny’s $15,000 subject to the under *410 standing that it would be used toward the capital contributions of his brothers, Bernard and Samuel, in the succeeding partnership in 1945. It was subsequently so used. See finding 14.
12. In September 1944, or thereabouts, Morris decided to terminate the 1944 partnership and form a partnership among his own immediate family. He thereupon exercised his right under the partnership agreement to terminate the partnership and served due notice of his intention on Dora as a general partner. The partnership was subsequently duly dissolved, and Dora and her daughters were paid for their interests.
1945 PARTNERSHIP
13. The preceding partnership having been dissolved, a limited partnership agreement was entered into pursuant to the laws of New York under date of March 31, 1945, retroactively effective to January 1, 1945, between Morris, party of the first part, as general partner, and Jennie, Danny, Bernard, Samuel, and Morris as trustee for the benefit of Irwin, parties of the second, third, fourth, fifth, and sixth parts, as limited partners. The agreement provided for total contributions of $100,000, Morris to contribute $40,000, Jennie $20,000, and the remaining limited partners $10,000 each. Pertinent provisions of the 1945 partnership agreement were as follows:
2. The First Party shall be the general partner and the Second, Third, Fourth, Fifth and Sixth Parties shall be limited partners in the said partnership.
3. The partnership business shall be conducted under the firm name of Uneeda Doll Co.
* * ‡ # *
5. The term of the partnership shall begin as of January 1, 1945 and shall terminate on December 31, 1949.
The First Party shall have tb.e privilege to terminate the partnership during the term thereof upon the service of a written notice to that effect upon the Second, Third, Fourth, Fifth and Sixth Parties, and then and thereupon this partnership shall ter] uinate upon the expiration of the period of thirty (30) days from the date of the service of such notice.
*411 @ * * *
The contributions of the First, Second, Third and Sixth Parties towards the capital of the partnership shall consist of the assets of the said parties enumerated and described in the balance sheet of the predecessor Uneeda Doll Co. as of January 1, 1945, hereto annexed and marked Exhibit “A” and made a part hereof, and of which Uneeda Doll Co. the First, Second and Third Parties were formerly co-partners. As appears from the said balance sheet the value of the equity of the First Party in the assets therein listed amounts to Forty-two thousand eighteen ($42,018.98) Dollars and 98/100; the value of the equity of the Second Party in the said assets amounts to Sixteen thousand eight hundred twenty-seven ($16,827.88) Dollars and 88/100 and the value of the equity of the Third Party in the said assets amounts to Twenty thousand nine hundred thirty-six ($20,986.88) Dollars and 83/100, out of which sum the said Third Party transferred and assigned to the Sixth Party as Trustee for the benefit of Irwin Sklarsky, the sum of Ten thousand ($10,000) Dollars. The sum of Two thousand eighteen ($2,018.98) Dollars and 98/100 representing the value of the assets over and above the sum of Forty thousand ($40,000) Dollars which the First Party has hereby agreed to contribute to the capital of the co-partnership and the sum of Nine hundred thirty-six ($936.83) Dollars and 83/100 representing the value of the assets of the said Third Party over and above the sum of Ten thousand ($10,000) Dollars which he has agreed to contribute to the capital of the partnership shall be deemed to be loans advanced by the First and Third Parties to the partnership and may be withdrawn by them at any time. The sum of Three thousand one hundred seventy-two ($3,172.12) Dollars and 12/100, representing the difference between the value of the assets contributed by the Second Party and the sum of Twenty thousand ($20,000) Dollars which she has agreed to contribute towards the capital of the partnership shall be contributed by her in cash upon the execution of this agreement.
* # * # *
7. * * * all moneys credited in such bank account or bank accounts to the partnership shall be subject to withdrawal by check only made in the name of the partnership and signed by the general partner. All other documents for the withdrawal of funds from the partnership account or accounts, such as promissory notes, *412 drafts, bills of exchange, shall likewise require the signature of the general partner only.
_ 8. The conduct of the business of the partnership shall lie exclusively in the hands of the general partner. That the limited partners shall have no voice in the management and conduct of its affairs.
* * * * *
11. The general partner shall receive a salary of Two hundred ($200) Dollars per week, and such salary shall be charged against the operating expenses of the business. That such salary of the general partner shall be in addition to any drawings which the parties hereto may, by mutual consent, draw from time to time, such drawings to be credited against the respective shares in the net profits of each of the parties hereto.
* * $ * *
18. That the limited partners shall not be required to make any additional contributions to the capital of the partnership. Provided, however, that if so requested by the general partner, the limited partners shall have to contribute towards the capital of the partnership 50% of the net profit for each year. Such request shall be made immediately upon the ascertainment of the extent of the profits for the previous year and prior to its withdrawal and distribution among the parties hereto, and thereupon 50% of the net profits distributable to each limited partner shall be retained as part of his additional contribution to the capital of the partnership. * * *
* * * * *
Anything herein to the contrary notwithstanding the First Party shall have the right at any time during the term of this partnership, at his option upon thirty (30) days written notice to any limited partner, * * * to elect to purchase the interest of such limited partner in the partnership. * * * it shall be encumbent upon such limited partner, * * * to sell, transfer and assign to the First Party all the right, title and interest of such limited partner in the partnership. * * * "
17. A limited partner shall have no right to substitute an assignee in his or her place.
18. The general partner shall have the right to admit additional general or limited partners upon such terms and conditions as he might find it desirable."
* * * * #
A certificate of limited partnership in accordance with the above agreement was filed in New York County on April 12, 1945.
*413 14. (a) Contributions to the 1945 partnership by Morris, Jennie, and Danny were made by transfers from their termination capital balances in the 1944 partnership. Jennie had a shortage of $3,172.12 in her termination capital account for this purpose which she made up in cash from her separate funds.
(b) Contributions to the 1945 partnership capital by Bernard and Samuel were made by two $10,000 checks to their separate order dated March 24 and 26, 1945, respectively, drawn by Morris on his personal account, endorsed by the payees and deposited to the credit of Uneeda in its bank account. Irwin’s contribution to the 1945 partnership capital was provided by a trust agreement dated January 2, 1945 (notarized three months later), between Danny and Morris whereby Danny transferred $10,000 of his partnership equity to Morris in trust for Irwin.
(c) The bookkeeping circumstances attending the actual contributions for Bernard, Samuel, and Irwin were circuitous, but the net result was that, of the $30,000 totaling these contributions, $10,000 represented a diminution of Danny’s capital account in the partnership, $15,000 represented the release by Danny of his funds in trust with Morris since September 1944, and the remaining $5,000 was a gift by Morris to Samuel.
(d) The method employed in the gifts to Bernard, Samuel, and Irwin was not inconsistent with plaintiff’s plan to bring his sons into the business as they matured, nor with Danny’s moral commitment to use his capital and earnings to supply the wherewithal to bring his brothers into the business. A more direct method could have been, but was not, followed.
15. This partnership continued until March 2,1946, when it was dissolved pursuant to the laws of New York. During its existence from January 1, 1945, to March 2, 1946, the partnership earned net profits of $372,605.86.[1] The follow *414 ing schedules show, for the periods from January 1,1945, to June 80, 1945, and from July 1, 1945, to March 2, 1946, the book distribution of the profits among the partners, withdrawals by the partners, and the resultant capital accounts of the partners at the end of the respective periods:

1946 CORPORATION
16. The Uneeda Doll Co., Inc., a corporation, was organized to succeed the partnership dissolved as of March 1, 1946. Transfer of the partnership assets to the corporation was effected pursuant to the terms of the following offer from the preceding partnership which was apparently accepted by the corporation at a corporation meeting:
The Secretary then presented to the meeting a written proposal from Uneeda Doll Co. to this Corporation.
Upon motion duly made and carried, the said proposal was ordered filed with the Secretary, and he was requested to spread the same at length upon the minutes; said proposal being as follows:
*415 Uneeda Doll Co., Inc.

425 Broome Street

New York City

GentlemeN : We hereby offer to sell to you all merchandise, machinery and fixtures, including accounts receivable, cash in bank, orders and any and all other assets of the corporation, and any and all moneys in the bank or banks belonging to the undersigned, subject to any and all accounts payable and every and all other obligations of the company, including also any and all patent rights, copyrights and good will of the company in all of the two hundred shares, of the no par value, common stock, of your corporation, same to be issued by you to the following persons or their nominees with the amounts set opposite their names:

Shares

Morris Sklarsky_ 55
Jennie Sklarsky_ 5
Daniel Sklarsky_ 10
Bernard Sklarsky_ 10
Samuel Sklarsky_ 10
Morris Sklarsky as Trustee for the benefit of Irwin Sklarsky.
(To be issued direct to Irwin Sklarsky.)_ 10
Very truly yours,
Uneeda Doll Co.
By (Sgd.) Morris Sklarsky,

Partner.

17. (a) The stated capital of the corporation was set at $200,000, divided into 100 shares of no-par value stock. On March 2,1946, stock certificates were issued in the amounts of 55 shares to Morris, 5 to Jennie, and 10 shares each to Danny, Irwin, Bernard, and Samuel. On September 12, 1946, the certificate issued to Irwin was canceled and a new certificate for 10 shares was issued in the name of Morris to replace it.
(b) On the stub of Morris’ original certificate for 55 shares in the stock certificate book a note was added reading: “Subject to private family agreement.” Plaintiff testified that the “private family agreement” referred to consisted of a transfer by Jennie to Morris of 20 shares to be held by the latter in trust for the minor sons, Jerome and Arnold, to provide for their entrance into the business upon attaining *416 sufficient maturity. No gift tax return was made relating to the alleged gift in trust. Morris received and retained the dividends on the 20 shares.
18. At the time of the formation of the 1946 corporation and the original issuance of stock, the plaintiff and his accountant, through apparent misapprehension of the function and characteristics of no-par value stock, erroneously concluded that each subscriber to the stock had to pay for it an equal amount per share arrived at by dividing the total number of authorized shares into the stated capital. In reliance upon this erroneous assumption, Morris believed that he was $83,829.82 short of having the amount required to pay for his shares, and there was transferred to his account from the capital accounts of each of the other family stockholders amounts totaling $83,329.32. None of the family members filed a gift tax return for these transfers to Morris (see finding 26 (b)).
REVIEW AND ADJUSTMENTS BY INTERNAL REVENUE SERVICE
19. Partnership and individual tax returns were filed when due by Morris and the affected members of his family for the tax years in question. After review and examination of plaintiff’s records the Internal Revenue Service refused to recognize Jennie and Danny as partners of Uneeda for the year 1944, or Jennie, Danny, Irwin, and Bernard as partners for the period January 1, 1945, to June 30, 1945, or Jennie, Irwin, and Bernard as partners for the period July 1, 1945, to March 2,1946. Thus, the Internal Revenue Service recognized Morris, Dora, Ruth, and Lillian as partners in 1944, and Morris and Samuel as partners from January 1,1945, to June 30, 1945, and Morris, Danny, and Samuel as partners from July 1, 1945, to March 2, 1946. On this basis the Internal Revenue Service made a determination that the distribution of partnership income for these periods should have been as follows:

*417

20. This reallocation of partnership income by the Internal Revenue Service for the three fiscal periods also affected the calendar year individual income tax returns. These individual returns were discussed by the Internal Revenue Service with the authorized representative of the taxpayer and his family, who agreed[2] with the decision. Thereafter, advice regarding overassessments or deficiencies was delivered by the Internal Revenue Service to each individual taxpayer.
21. Reallocation of the partnership income by the Internal Revenue Service, as it affected the several individual income tax returns, is shown in the following table:
*418 Partnership income as reported on individual income taw returns, and as adjusted by the Internal Revenue Service

22. The effect of the Internal Revenue Service’s reallocation of partnership income as shown above is reflected in the following schedule, which shows for each individual the amount of income tax paid, and the overassessment or deficiency for each year as computed by the Internal Revenue Service. The deficiencies were assessed against plaintiff in 1949.
*419 Individual income taw paid, and overassessment or deficiency as determined l>y Internal Revenue Service*

23. Payment of the deficiencies asserted against plaintiff, with interest charges thereon, was made as follows:

Schedule of payments of deficiencies and interest

24. On March. 3, 1950, plaintiff filed with the Internal Revenue Service a claim for refund of $36,389.28 on his 1944 tax, for $49,870.45 on his 1945 tax, and for $33,685.11 on his 1946 tax, on the stated grounds that—
Partnership agreement and division of partnership income as reported on original returns of Uneeda Doll Co., *420 and of partners thereof, were legal, correct and proper and the disallowance of said distribution of partnership earnings which resulted in the above payment should be refunded as being unlawfully collected.
On July 3, 1950, the Internal Eevenue Service denied plaintiff’s claim for refund on account of his 1945 and 1946 taxes, and on July 18, 1950, it denied plaintiff’s claim for refund on account of his 1944 tax.
ENJOYMENT OF INCOME FROM PARTNERSHIPS
25. (a) Succeeding findings summarize the use or enjoyment by each partner of his distributive share of the profits from the successive partnerships from January 1, 1944, to March 2, 1946. Although Morris, Jennie, and Danny were carried as partners in both partnerships, the data as to them is given for the combined period rather than broken down into the three separate periods, because such treatment affords a clearer and more accurate picture of their roles as partners due to the overlapping nature of certain of the transactions.
(b) The stated capital interest of each stockholder in the 1946 corporation was automatically reduced 50 percent in 1949 by a 50 percent reduction in the stated corporate capital done to give plaintiff access to enough funds to pay his personal income tax liability in connection with the settlement referred to in finding 23.
(c). None of the stockholders in the 1946 corporation had beneficially received dividends from the corporation to the time of trial because, although the corporation declared dividends on several occasions, the recipients endorsed and deposited them in the corporation account. The record does not disclose whether thé corporation executed notes to secure the-indebtedness to the stockholders or whether the debts are carried on the corporate books as due the stockholders. The recipients of the dividends reported and paid taxes on them to the Internal Kevenue Service as dividend income.
26. (a) During the combined period of the successive partnerships from January 1,1944, to March 2,1946, Danny was credited on the partnership books with $86,364.59 as *421 his share of partnership profits. His distributive share was disbursed or used for the following purposes:
(1) Federal and state taxes_$38,340. 88
(2) Gifts to brothers to pay for their 1945 partnership interests_ 25,000.00
(3) Transfer to Morris in 1946_ 13,000.00
(4) Loan to 1946 corporation_ 3,951.15
(5) Increase in Danny’s opening capital account in 1946 corporation over his opening capital account in 1944 partnership (i. e., $20,000 versus $15,000)_ 5,000.00
(6) Debits to account for book adjustments not representing withdrawals by Danny_ 1,072.66
(7) Cash withdrawal_ 600.00
86,364.59
Items (1), (6), and (7) are self-explanatory. While Item (4) appears in the books as a loan payable to Danny, it is more likely that it was set aside for payment of Danny’s taxes, since by January 14, 1947, the corporation paid $3,-482.20 for Danny’s federal and state taxes. The circumstances as to item (2) are described in finding 14 (b). Item (5) is described in finding 25 (b). Item (3) is described in the following paragraph (b) of this finding.
(b) As related in finding 18, Morris was short $83,329.32 of having the amount he and his accountant thought necessary to pay for his shares in the 1946 corporation, and the other members of his family supplied the deficiency by transfers to Morris of sums from their closing capital accounts in the partnership on March 1, 1946. There was thus transferred $31,329.32 by Jennie and $13,000 each by Danny, Bernard, Irwin, and Samuel. No gift taxes were paid on these transfers, nor were they reported as gifts. They were not treated by Morris as income.
(c) In addition to Danny’s $86,364.59 share of credited partnership profits, referred to in paragraph (a) of this finding, during the same period he received a total salary of $2,190 from the partnership for services rendered.
(d) The Internal Revenue Service recognized Danny as a partner for the period July 1, 1945, to March 2,1946 (finding 19).
27. (a) During the entire period of Bernard’s participation as an ostensible partner in the second partnership from January 1, 1945, to March 2, 1946, he was credited on the partnership books with $37,260.59 as his share of partnership *422 profits. His distributive share was disbursed or used for the following purposes:
(1) Federal and state taxes_$7,600. 00
(2) Transfer to Morris in 1946_ 13,000.00
(3) Loan to 1946 corporation_ 6,660.59
(4) Increase in Bernard’s opening capital account in 1946 corporation over his opening capital account in 1945 partnership (i. e., $20,000 versus $10,000)_ 10,000.00
37,260.59
Item (1) is self-explanatory. The facts concerning item (2) are described in finding 26 (b). The sum of $6,660.69 as to item (3) appears as an opening entry in the 1946 corporation books as a loan payable by the corporation to Bernard, but it is more likely that it was set aside to pay his income taxes, since by January 14,1947, the corporation had paid $6,150.34 for Bernard’s federal and state income taxes. Item (4) is described in finding 25 (b).
(b) In addition to Bernard’s $37,260.59 share of credited partnership profits referred to in paragraph (a) of this finding, during the same period he received a salary of $352 from the partnership for services rendered.
(c) The Internal Revenue Service did not recognize Bernard as a partner during the period involved.
28. (a) Irwin’s interest as an ostensible partner, held in trust for him by Morris, extended during the life of the second partnership from January 1, 1945, to March 2, 1946. During this period Morris, as trustee for Irwin, was credited on the partnership books with $37,260.59 as his share of partnership profits. None of this money is shown to have been paid to Irwin in his individual capacity, and the record .shows that it was disbursed or used for the following purposes:
(1) Federal and state taxes_$7, 600.00
(2) Transfer to Morris, individually, in 1946_ 13, 000.00
(3) Loan to 1946 corporation_ 6,660.58
(4) Increase in Irwin’s opening capital account in 1946 corporation over his opening capital acount in 1945
partnership (i. e., $20,000 versus $10,000)_ 10,000.00
37,260.58
Item (1) is self-explanatory. The facts concerning item (2) are described in finding 26 (b). The explanation of items *423 (3) and (4) parallels comparable items in finding 27 as to Bernard.
(b) In 1946 Irwin told Morris that lie was not interested in participating in the family business, so in September 1946 the stock in Irwin’s name was transferred to Morris, although it originated with Danny’s trust deposit of $15,000 with Morris in September 1944 as related in findings 14 and 17. Plaintiff contended that he is holding Irwin’s stock as security for $9,897.50 advanced by Morris to extricate Irwin from certain legal difficulties,[3] but Irwin’s lack of desire to join in the family business and the lack of fiduciary circumstances attending Morris’ acquisition and holding of the stock, combine to the conclusion that Morris is and has been holding the stock as his own in order to cumulate his control over the business.
(c) There is no record during the years in question of the filing of income tax returns in the name of the trust, although returns were filed for Irwin in his individual capacity as taxpayer.
(d) The Internal Revenue Service did not recognize Irwin as a partner for the period involved.
29. (a) During the entire period of Samuel’s participation as an ostensible partner in the second partnership from January 1, 1945, to March 2, 1946, he was credited on the partnership books with $37,260.58 as his share of partnership profits. His distributive share was disbursed or used for the following purposes:
(1) Federal taxes for 1944_$7,600. 00
(2) Transfer to Morris in 1946_ 13,000.00
(3) Loan to 1946 corporation- 6,660.58 (4) Increase in Samuel’s opening capital account in 1946 corporation over his opening capital account in 1945 partnership (i. e., $20,000 versus $10,000)_ 10,000.00
37,260.58
Item (1) is self-explanatory. The explanation of items (2), (3), and (4) is the same as that of comparable items in findings 27 and 28 relating to Bernard and Irwin, respectively, except for inconsequential variations in amounts.
(b) In addition to Samuel’s $37,260.58 share of the credited partnership profits referred to in paragraph (a) of *424 this finding, during the same period he received a salary of $934.48 from the partnership for services rendered.
(c) The Internal Revenue Service recognized Samuel as a partner for the period from January 1, 1945, to March 2, 1946.
30. During the combined period of the successive partnerships from January 1, 1944, to March 2, 1946, Jennie was credited on the partnership books with $107,257.16 as her share of partnership profits. Her distributive share was disbursed or used for the following purposes:
(1) Federal and state taxes-[1]$33, 847. 75
(2) Transfer to Morris in 1946- 31,329.32
(3) Loan to 1946 corporation_ 31,308.20
(4) Debits to account for book adjustments not representing withdrawals by Jennie_ 771.89 (5) Check endorsed by Jennie and deposited in Morris’ personal account_ 10,000.00
107,257.16
Item (1) is self-explanatory. The circumstances as to item (2) are provided in finding 26 (b).
As to item (3), $10,625.32 of the $31,308.20 appearing in the opening entries of the 1946 corporation books as a loan payable to Jennie, was shortly thereafter charged to Jennie for repairs and furnishings for the family home, title to which was in Jennie’s name, although it was occupied by Morris and his family. The charges had previously been paid by Morris, but subsequent to the formation of the corporation in 1946, they were transferred, retroactively to March 1,1946, as a charge to Jennie’s capital account, and a corresponding credit was entered in Morris’ account. Of the $20,682.72 remaining in the “loans payable” account of Jennie at the beginning of the 1946 corporation, about $15,000 of it was apparently set aside to pay her taxes, since by January 14,1947, the corporation had paid $15,256.38 of her taxes as they became due. The precise use of the remaining $5,426.34 cannot be determined, although it is established that, by the end of 1946, the corporation paid out and charged to Jennie’s account $11,027.45 for medical expenses, $199.90 for unidentified insurance, and $257.91 for expenses relating to the family home.
*425 Item (4) of the foregoing enumeration cannot be identified in terms of benefit to Jennie, and none of the constituent charges were represented by a check received by Jennie.
Item (5) for $10,000 represents a withdrawal in that amount in September 1944 by a partnership check to Jennie which she endorsed to Morris prior to its deposit in his personal bank account (finding 11 (b)), and which was used by him as Jennie’s contribution to the purchase of the stock of Broome Affiliates, Inc., which owned the building occupied by the partnership as lessee.
31. (a) During the combined period of the two successive partnerships from January 1,1944, to March 2,1946, Morris was credited on the partnership books with $230,882.34 as his share of the partnership profits. In addition, during the same period he received $22,600 in salaries from the partnership and, just prior to formation of the corporation, there was transferred $83,329.32 from Jennie, Danny, Bernard, Irwin, and Samuel, as related in finding 26 (b). Substantially all of these increments totaling $336,811.66 were used or can be accounted for in the following manner:
(1) Federal and state taxes-$32,661. 88
(2) Withdrawals, less payments to Dora and daughters for their interests in 1944 partnership_ 145,559.86
(3) Payments to Dora and daughters for their interests in 1944 partnership_ 15, 843.52
(4) Charges to Morris’ account in nature of book adjustments not represented by cheeks to his order or disclosed by the record to be a benefit to him_ 6, 578.38
(5) Increase in stated value of Morris’ opening capital account in 1946 corporation over his opening capital account in 1944 partnership (i. e., $110,000 versus $25,000) _ 85,000.00
(6) Loan to 1946 corporation_ 44,411.54
330, 055.18
Item (1) for federal taxes represents that portion of Morris’ federal taxes for 1944, which were paid by the partnership and charged to his account. While an additional $131,650.51 in taxes due from Morris accrued during the entire period of the partnerships ($123,939.73 in federal taxes and $7,710.84 in state taxes), these additional taxes were paid partly by the plaintiff from his personal funds and partly by the 1946 corporation and charged to plaintiff’s account, as will appear.
*426 Item (2) for withdrawals by plaintiff during the entire partnership periods was in the total amount of $161,403.38 but has been reduced to $145,559.86 by the elimination of $15,843.52 which plaintiff used to pay Dora and her two daughters for their retirement from the 1944 partnership. Disposition of the remaining $145,559.86 is not entirely clear in the record, but it is reasonable to conclude that plaintiff used $80,760.97 for taxes ($75,720.83 federal and $5,040.14 state), and about $6,000 as his contribution to the purchase of the stock of Broome Affiliates, Inc., to which latter reference has been made in finding 30. It is also reasonable to conclude, in the absence of partnership records, that another $26,670.68 was used to pay for the balance due in the purchase of 55 shares of stock in the 1946 corporation after the application to that purchase of the $83,329.32 transferred to Morris by his family. Thus, of the total $161,403.38 denominated as withdrawals by Morris during the period of the partnerships, there has been accounted for all but $32,-128.21, as to which the record offers no basis for a conclusion other than that this amount was a pecuniary benefit to Morris. Note, however, that $22,600 of this residual benefit consisted of salary from the partnership, thus reducing the net benefit to Morris as a partner to $9,528.21.
Item (3) has been explained in the foregoing analysis of item (2).
Item (4) consists of three charges to Morris’ account as to which it cannot be determined whether or not they resulted in pecuniary benefit to Morris.
Item (5) is self-explanatory. The decapitalization of the corporate stock in 1949, however, reduced the stated value of Morris’ shares at that time by 50 percent, as in the case of the other stockholders.
Item (6) represents a setting aside in the opening entries of the 1946 corporation books of $44,411.54 for the apparent purpose of paying Morris’ taxes, although the amount was placed in the “loan account” as a credit to Morris. By January 14, 1947, the corporation had paid $43,270.70 in taxes for Morris ($40,600 in federal taxes and $2,670.70 in state taxes), and, so far as the record discloses, the balance of *427 $1,M0.84 remaining from the set-aside of $44,411.54 in the loan account was a pecuniary benefit to Morris.
(b) In addition to the total increments to Morris referred to in paragraph (a) of this finding, the following transactions concerning the partnerships, not duplicated in paragraph (a), may have been of financial benefit to Morris and of corresponding financial detriment to one or more members of his family:
(1) Shortly after the formation of the corporation in 1946 entries were made in the corporate books, backdated to March 1,1946, charging Jennie’s account with $10,625.48 and crediting Morris’ account in the same amount. This charge represented costs theretofore paid by Morris for the repair and furnishing of the family home, title to which was in Jennie’s name, as set forth more particularly in finding 30.
(2) In 1949 the corporate stock was decapitalized 50 percent in stated value in order to provide funds for the settlement of Morris’ tax deficiencies. The corporation paid the tax deficiencies at that time, and the effect on the stock held by Jennie, Danny, Bernard, and Samuel was to reduce its stated value by $35,000. The record does not disclose whether the corporation books carry the transaction as an obligation by Morris to the corporation, or whether any part of it has been reimbursed.
(3) In the course of termination of the 1944 partnership, Morris was required under the terms of the 1944 partnership agreement to pay Dora and her two daughters the sum of $47,690.56 for their partnership interests. However, in effect, Morris paid $28,582.34 of this amount and the other members of the 1945 partnership paid $19,108.22. Thus, although Morris acquired the interests of Dora and her two daughters, his wife and sons paid $19,108.22 of the cost (see finding 12).
SERVICE CONTRIBUTIONS TO PARTNERSHIPS
32. Morris indoctrinated each of his sons in the family business as young children by having them spend their spare time in and around the plant, performing small chores, and familiarizing themselves with the general operations. This *428 indoctrination customarily started at about tbe age of eight years, and from that age onwards through their adolescence the boys were often in the plant in the hours after school, on Saturdays, and during vacations.
33. (a) In 1938 after partial completion of a college course, Danny went to work full-time for Uneeda. Until his induction into the Army in February 1941, Danny worked there full-time in both the selling and production departments, and was receiving a weekly salary of $25 by the time of his induction.
(b) He was in the Army from February 1941 to his discharge in June 1945, and during this time was stationed successively in Tesas and California. It is not indicated that he spent any of his 36 days of furlough in 1944 in New York.
(c) During his military absence Danny corresponded with his family and telephoned them on the average of twice monthly. An unknown number of these telephone conversations with his father, as well as his correspondence, related to partnership business matters, for Danny was well-versed in production problems and his advice was of value to his father. Danny was consulted in this manner with reference to the 1944 and 1945 partnership agreements. During the latter part of his Army service Danny conceived in his free time precision machinery to replace the hand machinery used in the doll business. He later developed and perfected his ideas, subsequently patented them in 1947, and his machinery was used successfully in the family business.
(d) Following his discharge from the Army in June 1945, Danny immediately returned to full-time employment in the family business and assumed managerial responsibility for cost determination. He received salaries of $2,190 for services to the business from July 1, 1945, to March 2, 1946.
34. (a) Bernard graduated from high school in June 1941. From July to December 1941 he worked at the Uneeda plant, then owned by his father and his uncle. In December 1941 he went to work as a machinist’s or toolmaker’s helper in a defense plant where he worked for about a year. For a few months in 1943 he went back to work *429 in the doll factory. He was then 18 years old. He was inducted into the Army on May 4,1943, and was discharged March 21, 1946.
(b) While Bernard was in military service, he was stationed at Aberdeen, Maryland, which enabled him to come to New York whenever he could get a week-end pass. His father would call him during the week to ascertain whether or not he expected to be in, and when he did come to New York he worked five or six hours on Saturday at the plant painting dolls’ heads, for which he was paid at about the going piece rate paid other painters in the factory. During 1944 and 1945, full-time painters were paid approximately $40 to $50 per week. At the end of the day Bernard would tell the bookkeeper how many dolls’ heads he had painted and she would pay him by regular payroll check. For the year 1945 he was paid a total of $352 for his services at the factory on Saturdays. His services and compensation during 1944 were comparable.
(c) While Bernard was named a partner by the partnership agreement dated March 31,1945, retroactively to January 1, 1945, his services on the Saturdays during 1945 did not differ substantially from the services he had performed on the Saturdays during 1944 before he was named a partner, and the method and rate of compensation likewise did not differ substantially.
(d) Upon his discharge from military service on March 26,1946, Bernard worked in the business for a month or two. His total wages from Uneeda for his services during 1946 were $170.
(e) He then went to work on a full-time basis for the Yim Electric Company, a chain of retail appliance and radio and television stores, as a salesman in one of the stores. He rose to become manager of one of the stores and subsequently became manager of several. He retained his position with the Vim chain until January 1954. During this period of between seven and eight years he did not come in at all to the Uneeda plant on Saturdays, Sundays, or holidays to paint dolls’ faces or in any other way help out about the business, and he did not receive any compensation from *430 the company. One of the causes for Bernard’s leaving, Vim’s in January 1954 was bis father’s statement to him that the family business now needed a salesman. His current rate of compensation, since January 1, 1954, is $12,500 per annum.
35. (a) At the age of 16 or 17 Irwin left New York City to attend the University of North Carolina. His intention was to go to medical school after graduation. Upon graduation, however, he reported for active duty in the United States Navy on October 1, 1943. He was released from active duty on June 19, 1946. During the entire period of his naval service he was on leave for 11 days, from January 21 to 31,1944.
- (b) Prior to the time he was inducted into the Navy, Irwin did not spend any substantial time assisting his father in the business, even during the summer months when he was not attending school. He did not perform any substantial services for the business at any time while he was in the Navy.
(c) When Irwin was released from active duty in June 1946, he did not want to go into the family business. He wanted to be a doctor and applied for admission to two or three medical schools. When his applications were rejected, he went back to the University of North Carolina for postgraduate work and studied until he obtained a master’s degree. When he was released from the Navy in 1946, he informed- his father that he had. no interest in the business, and he attended various educational institutions during the entire period between 1946 and 1951. Plis father listed him as a dependent on his own income tax return, for the years 1947,1948,1949, and 1951, and supported him for the entire period. In 1952 Irwin listed his occupation on his income tax return as a free-lance writer and has so regarded himself.
36. (a) Samuel graduated from high school in June 1943 and from July through December of that year worked part-time in his father’s business. In January 1944 he attended the University of North Carolina. After becoming ill he came home in February 1944, worked occasionally in the business while recuperating, and attended New York Uni *431 versity starting in September. In the fall of 1944 he rendered some part-time assistance in the business after school hours. In January 1945 he left the University and went to work in a supervisory capacity on a full-time basis in the production department of the plant. He has been employed at Uneeda on a full-time basis since that time.
(b) For the years 1943 and 1944 Samuel was listed by plaintiff on his tax return as a dependent. He has always lived with his parents. Samuel received some compensation for his services during the latter part of 1944, but it was not on a regular basis and the amount was not large enough to warrant the filing of an income tax return for 1944. During the years 1945 and 1946, through the termination of the partnership, Samuel was paid a total of $934.48 for his services.
(c) Since the incorporation of the business in 1946, Samuel has been paid the following wages or salaries by the business for his services:
1946_$1,290.00
1947_ 810. 00
1948_1_ 1, 895.00
1949 - 2,410.00
1950_ 1, 200. 00
1951_ 3, 708.23
1952 - 4, 505. 00
37. (a) Jennie rendered assistance to plaintiff in his various business activities preceding the partnerships at issue as referred to in finding 4. Her services were largely at home and consisted of designing doll dresses and advising plaintiff and his brother on dress materials and designs for the dolls. During the taxable years at issue she continued on a reduced scale to give advice to her husband and pass judgment with respect to dress materials and designs. Such ■services as she performed during the years at issue were entirely at home, except for the “shopping” of competitive wares. During the partnership years at issue she had two minor children to care for, one born in 1939, and the other in 1945, and was responsible for the running of the taxpayer’s household, although her sister assisted in these chores.
*432 (b) At no time prior to the taxable years at issue was Jennie paid money in her own name by Uneeda for the value of her services. It is reasonable to believe plaintiff’s claim that his own drawings from the preceding business with his deceased brother were supposed to include the value of her services as well as his own, although he never maintained a joint bank account with her with respect to such funds. It is not indicated how much of his earnings belonged to her as her own.
(c) At no time prior to 1943 did Jennie Sklarsky file an income tax return indicating the receipt of income. From the years 1936 to date the taxpayer filed returns for the income from his business ventures.
38. Dora and her two daughters, Lillian Winters and Ruth Schwartz, were recognized as general and limited partners, respectively, in Uneeda for the year 1944 by the Internal Revenue Service. Their service contributions were meager. Dora visited the plant periodically and, at irregular intervals, clipped threads from doll dresses. Lillian occasionally did some typing in the office. Ruth performed no services, but was a full-time employee in a lingerie shop.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, together with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c) of this court.
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 7, 1958, that judgment for the plaintiff be entered for $175,670.42, together with interest thereon as provided by law.

 The difference between this figure of $372,605.86, which is based upon the audit reports prepared by üneeda’s accountant, and the figure of $388,310.24, which was reported in partnership income returns as net income for the same period, is represented by salaries paid by TJneeda to Morris, Danny, Samuel, and Bernard.

 1. e., taxpayer signed an agreement form which: purportedly was designed to permit an immediate assessment without further notice in order to terminate the running of interest, so that taxpayer could pay the disputed amount and sue for its recovery.

 The record establishes that Morris paid $9,897.50 for Irwin’s legal expenses.

 $37,019.87 was the amount actually paid out by the partnership for Jennie’s taxes during the period, but she reimbursed the partnership with $3,172.12 of this from her personal funds.

 After allowing for a Post War Excess Profits Credit of $2,067.47.

 The difference between the total of $163,679.98 appearing in the above schedule as the 1944 profits distributed to Morris, Jennie, and Danny, which figure is based upon the audit report prepared by Uneeda’s accountant, and the figure of $174,953.84, which was reported in partnership income returns as net income for Morris, Jennie, and Danny for the same period (finding 15), is apparently represented by salaries paid by Uneeda to these three individuals.

 Amounts shown in Plaintiff’s Exhibit 49 are incorrect.

 This was an allowance made by Internal Kevenue Service for salary, but Blaintifl's Exhibit 34 notes it as partnership income.